United States District Court
Southern District of Texas

**ENTERED**
September 26, 2025
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Amanda R.,[1] | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action H-24-2952 |
| | § | |
| Frank J. Bisignano,[2] | § | |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

Amanda R. appeals the Social Security Administration Commissioner's final decision denying her application for Social Security benefits. ECF No. 1. Pending before the court are Plaintiff's Motion for Summary Judgment, ECF No. 11; and the Commissioner's Response and Cross Motion for Summary Judgment, ECF No. 18. The parties consented to the jurisdiction of the undersigned magistrate judge for all purposes, including entry of final judgment. ECF Nos. 7, 8. Plaintiff's Motion for Summary Judgment is **DENIED**. The Commissioner's Motion for Summary Judgment is **GRANTED**. The Commissioner's final decision is **AFFIRMED**.

### 1. *Procedural Posture*

On October 12, 2021, Amanda filed applications for disability insurance benefits, under Title II of the Social Security Act, and supplemental social security income benefits, under Title

---

[1] In light of guidance received from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which states that there are significant privacy concerns in social security cases, the court refers to the Plaintiff only by her first name and last initial.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Frank J. Bisignano is substituted as the defendant in this suit.

XVI of the Social Security Act. Tr. 56–57. Amanda alleged that her disability began on March 8, 2020, due to narcolepsy, REM sleep behavior disorder, sleep apnea, restless leg syndrome, major depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, PTSD, childhood trauma, and irritable bowel syndrome (IBS). Tr. 58, 67.

The SSA denied both of Amanda's applications at the initial level on June 6, 2022, and upon reconsideration on January 10, 2023. Tr. 105–09, 110–14, 118–22, 123–26. Administrative Law Judge (ALJ) William Sharp held a hearing on June 28, 2023. Tr. 39–55. Amanda's counsel was present at the hearing. Tr. 41. Amanda testified about her education, work history, and medical conditions. Tr. 42–54.

Amanda testified that she was between her junior and senior years of college, and that she would be graduating from Texas A&M University, with a major in environmental studies, in one year. Tr. 43. She described the disability accommodations provided to her by the university, which included double-time testing in a private room with the ability to take breaks as needed, permission to bring food and drinks to the classroom, and modified class attendance policies. Tr. 44.

As to her work history, Amanda testified that she had not earned money or wages since April 2019. Tr. 45. Prior to that, she held various roles, including as a legal assistant, receptionist, and bank teller. Tr. 45–47. Amanda testified that she could not work full-time due to her narcolepsy with cataplexy, REM sleep disorder, anxiety, depression, PTSD, panic attacks, sciatic nerve pain, and IBS. Tr. 49–54.

As to her narcolepsy, Amanda testified that she would experience "hypn[a]gogic hallucinations and excessive daytime sleepiness, sleep paralysis, cataplexy, and sleep episodes." Tr. 49. She testified that she suffered from a cataplectic episode, in which

she would collapse to the floor, on a weekly basis. Tr. 49–50. She stated that she would fall asleep during the daytime on a daily basis, and that she had fallen asleep while performing activities like driving, typing, conversing, and taking exams. Tr. 50. She stated that she also suffers from sleep episodes, in which it may appear as if she is awake while she is performing an "automatic behavior" (such as typing, writing, filing papers, driving, or walking), but she will really be asleep. Tr. 51. She explained how these sleep episodes might cause her to file papers incorrectly or type or write "gibberish instead of actual words." *Id.* Amanda also explained that her sleep problems were compounded by REM sleep behavior disorder and sleep apnea. Tr. 52, 54. Amanda reported that while medication helped her narcoleptic symptoms, it caused her to experience disorientation, sleepiness, and anxiety. Tr. 52, 53.

Amanda testified about her mental health conditions, including anxiety, depression, PTSD, and panic attacks. Tr. 53–54. She reported that these conditions would hinder her ability to concentrate at work. Tr. 53. She also testified that she was very shy and reserved around other people. *Id.*

As to physical ailments that would prevent Amanda from working full-time, Amanda testified about her sciatic nerve pain, for which she sought treatment from a chiropractor. Tr. 52. She testified that her sciatic nerve pain was so severe that she could only tolerate about an hour to an hour-and-a-half of sitting and about thirty minutes of standing. Tr. 52–53. Additionally, Amanda explained that her IBS could have a "major impact" on her work. Tr. 54. She explained that her IBS would cause her to take unexpected breaks to use the bathroom multiple times a day. *Id.*

After her testimony, the ALJ informed Amanda that he would take the case under advisement. Tr. 54. He explained that once he was able to "look more closely at the information involved,"

he would send interrogatories to the Vocational Expert (VE) with an appropriate proffer to Amanda's counsel. *Id.* The ALJ explained that Amanda's counsel would be able to submit cross-examination questions and "directions and questions of her own" to the VE. Tr. 54–55.

The ALJ sent interrogatories to the VE on August 4, 2023. Tr. 310. The interrogatories presented a series of questions, for which, while answering, the VE was to imagine a hypothetical claimant. Tr. 310–13. The hypothetical claimant was described as a person of Amanda's same age, education, and work experience, who was limited to the light level of exertion, secondary to daytime somnolence and obesity, and who could occasionally climb ladders, ropes, and scaffolds; frequently balance, kneel, and crawl; occasionally stoop and crouch; occasionally be exposed to heights, open flames, dangerous machinery, and exposed electrical currents; frequently interact with supervisors, coworkers, and the public; maintain adequate concentration, persistence, and pace to remain on-task for 95% of the workday, secondary to daytime somnolence and psychological symptoms; and frequently adapt to changes in workplace methods and routines. Tr. 311. The VE responded that a hypothetical claimant with these characteristics could perform Amanda's past work as described in the Dictionary of Occupational Titles (DOT). Tr. 312. Additionally, the VE stated that such a person could perform the following unskilled positions within the DOT job classifications: maker, mail clerk, and assembly/small products. *Id.*

On August 17, 2023, the ALJ sent Amanda's counsel a copy of the VE's response to the vocational interrogatory. Tr. 316–18. In reply, Amanda's lawyer declined any cross-examination, but she argued that "[t]he work limitations given by [Amanda's neurologist, Dr. Moghalu] need to be given to the vocational expert before a decision is rendered in this case." Tr. 319. The ALJ stated

that the attorney's response constituted "a request and legal argument[,] which is incorrect and therefore denied . . . ." Tr. 20.

The ALJ issued his decision on November 9, 2023, finding that Amanda was not disabled from March 8, 2020, through the date of the decision. Tr. 17–19, 34. Amanda requested review of the ALJ's decision, which the Appeals Council denied on May 20, 2024. Tr. 4. Amanda timely filed a complaint and an application to proceed in forma pauperis in federal court on July 16, 2024. *See Amanda R. v. Comm'r of Soc. Sec.*, 4:24-mc-01120, ECF No. 1 (S.D. Tex. July 16, 2024).

### 2. *Legal Standards*

The Social Security Act provides disability insurance benefits to individuals with physical and mental disabilities who have contributed to the program and provides supplemental security income to individuals with physical and mental disabilities who have limited income and resources. *See* 42 U.S.C. §§ 423, 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner uses a sequential, five-step approach to determine whether the claimant is disabled. *Schofield v. Saul*, 950 F.3d 315, 317 (5th Cir. 2020); 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof on the first four steps, and the Commissioner bears the burden on the fifth step. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021). A finding that the claimant is disabled or not disabled at any point in the five-step review terminates the analysis. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

This court's "review of the ALJ's [disability] determination is highly deferential," *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th

Cir. 2018) (citations omitted). The court "ask[s] only whether substantial evidence supports the decision and whether the correct legal standards were employed." *Id.* "A decision is supported by substantial evidence if 'credible evidentiary choices or medical findings support the decision.'" *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance.'" *Id.* (quoting *Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The reviewing court must scrutinize the record to determine whether substantial evidence supports the ALJ's decision, but it may not reweigh the evidence or substitute its judgment. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

### 3. *Analysis*

#### A. *Step One*

At step one, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). A person engaged in substantial gainful activity is not disabled, regardless of her medical condition, age, education, or work experience. *Id.*

The ALJ found that Amanda has not engaged in substantial gainful activity since the alleged onset date. Tr. 23. Amanda testified that she had not worked since 2019, and the record showed that she did not have income in 2020, 2021, 2022, or 2023. *Id.* Amanda does not dispute the ALJ's step-one finding.

### B. Step Two

At step two, the ALJ determines whether any of the claimant's impairments, or any combination thereof, is severe and has lasted or is expected to last a continuous period of at least twelve months. 20 C.F.R. §§ 404.1520(a)(4)(ii) (citing 20 C.F.R. § 404.1509), 416.920(a)(4)(ii) (citing 20 C.F.R. § 416.909). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c), 416.920(c). An impairment is "not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience." *Keel*, 986 F.3d at 555 (quoting *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985)). "A person who does not have a 'severe impairment' is not disabled." *Schofield*, 950 F.3d at 318 (citing 20 C.F.R. § 404.1520(c)).

The ALJ found that Amanda has the following medically determinable severe impairments:

> somatic symptom disorder, narcolepsy, REM sleep behavior disorder, sleep apnea, restless leg syndrome, depressive disorder, anxiety disorder, obsessive compulsive disorder, posttraumatic stress disorder, IBS[,] . . . GERD[,] OSA[,] seasonal allergies[,] eating disorder[,] and morbid obesity[.]

Tr. 23. Amanda does not dispute the ALJ's step-two findings.

### C. Step Three

At step three, the ALJ determines if any severe impairment meets or equals a listed impairment (Listing) in Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Listings describe impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. §§ 404.1525(a),

416.925(a). The claimant will be found disabled if the claimant's impairments meet or equal all of the specified criteria of a Listing. 20 C.F.R. §§ 404.1520(d), 416.920(d); *Whitehead*, 820 F.3d at 781. The claimant has the burden of establishing that their impairments match the Listing. *Whitehead*, 820 F.3d at 781.

The ALJ found that Amanda did not have an impairment or combination of impairments that meets or medically equals the severity of an impairment in the Listing. Tr. 23. Amanda does not dispute this finding.

"Although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, epilepsy." SSA Program Operations Manual System (POMS) DI 24580.005 (Sep. 26, 2016). The ALJ determined that Amanda's neurological impairments do not meet or equal the severity of impairments in Listing 11.02 because he did not find that the medical records reflected a history of narcoleptic/cataplexic events that occurred for the frequencies and durations outlined in the Listing. Listing § 11.02; Tr. 23.

The ALJ also determined that Amanda's mental impairments, considered singly and in combination, did not meet or equal the severity of impairments in Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders) because Amanda did not satisfy the "paragraph B" or the "paragraph C" criteria. Tr. 86–87. To be found disabled at step three, a claimant's mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. Listing § 12.00(A)(2). A claimant who does not satisfy either of paragraphs B or C cannot meet or equal the severity of impairments in the Listings in section 12.

The paragraph B criteria "represent the areas of mental functioning a person uses in a work setting." Listing

§ 12.00(A)(2)(b). Those areas are the claimant's ability to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* The ALJ must evaluate the claimant's ability to function using this five-point rating scale:

a. No limitation (or none). [Claimant is] able to function in this area independently, appropriately, effectively, and on a sustained basis.

b. Mild limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

c. Moderate limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

d. Marked limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

e. Extreme limitation. [Claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis.

Listing § 12.00(F)(2). To meet the paragraph B criteria, a claimant's disorder must result in an "extreme" limitation in one, or a "marked" limitation in two of the four areas of mental functioning. *Id.* The ALJ found that Amanda had only moderate or mild limitations in each of the four areas. Tr. 24.

As for understanding, remembering, or applying information, the ALJ determined that Amanda had a mild limitation because Amanda was alert and oriented, with fluent, clear speech and good repetition, comprehension, and naming. Tr. 24 (citing Tr. 980–81). Her medical records also reflected that her long- and short-term memory were intact. *Id.*

As for interacting with others, the ALJ determined that Amanda had a moderate limitation. Tr. 24. While Amanda claimed

some difficulty relating to others, she was pleasant, cooperative, sat calmly, and exhibited appropriate affect and euthymic mood. *Id.* (citing Tr. 969). The ALJ reiterated that Amanda was alert, oriented, and demonstrated clear, fluent speech with good repetition, comprehension, and naming. *Id.* (citing Tr. 980–81).

As for concentrating, persisting, or maintaining pace, the ALJ determined that Amanda had a moderate limitation. Tr. 24. Though the ALJ believed that Amanda's somatic symptoms would interfere with her work focus, Amanda's attention and concentration were found to be grossly intact. *Id.* (citing Tr. 969). Amanda's thought processes were logical, linear, goal directed, and intact, as evidenced by her ability to meaningfully participate in development of her treatment plan and her understanding of the importance of adherence to medications. *Id.* (citing Tr. 969).

As for adapting or managing oneself, the ALJ determined that Amanda had a moderate limitation. Tr. 24. The ALJ found that Amanda's focus on her medical conditions would "prevent some degree of adaptation to changing work conditions and circumstances" and cause difficulty with productively managing her behavior at work. *Id.* However, the ALJ stated that Amanda testified about her motivation towards working on her undergraduate degree in environmental science, and she reported to medical providers that she was exercising more through swimming, cycling, and taking yoga classes. *Id.* (citing Tr. 797, miscited as Tr. 796).

Because Amanda did not have at least two "marked" limitations or one "extreme" limitation in the four areas of mental functioning, the ALJ determined that she did not satisfy the paragraph B criteria. Tr. 24.

The ALJ determined that Amanda failed to satisfy the paragraph C criteria because the evidence did not show that her mental impairments were "serious and persistent"—that is, her

impairments did not exist over a period of at least two years,
accompanied by evidence of ongoing medical treatment that
diminished the symptoms of her mental disorders, plus marginal
adjustment. Tr. 24–25; *see also* Listing §§ 12.00(G)(2) (explaining
the medical history that satisfies the paragraph C criteria).

The ALJ's step-three determination is supported by
substantial evidence and comports with the law. Amanda does not
challenge the ALJ's step-three findings.

### D. Residual Functional Capacity

Before reaching the final two steps, the ALJ must assess the
claimant's residual functional capacity (RFC). 20 C.F.R.
§§ 404.1520(e) (citing 20 C.F.R. § 404.1545), 416.920(e) (citing 20
C.F.R. § 416.945). The RFC is a determination of the most a
claimant can do despite all physical and mental limitations. *Perez*,
415 F.3d at 461–62 (citing 20 C.F.R. § 404.1545(a)(1)). The RFC
determination is based on "the medical evidence in the record,
including the testimony of physicians and the claimant's medical
records." *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021). "An
'ALJ is responsible for determining an applicant's residual
functional capacity.'" *Id.* (quoting *Ripley v. Chater*, 67 F.3d 552, 557
(5th Cir. 1995)); *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c).

The ALJ determined that Amanda had the RFC to perform
work at the light exertional level, but her capacity is

> limited by her daytime somnolence and
> obesity, . . . except the claimant can occasionally climb
> ladders, ropes and scaffolds, and stoop and crouch; can
> frequently balance, kneel, and crawl; can have
> occasional exposure to heights, open flames,
> dangerous machinery[,] and exposed electrical
> currents; can frequently interact with supervisors,
> coworkers, and the public; can maintain adequate
> concentration, persistence, and pace to remain on task
> for 95 percent of the workday secondary to daytime
> somnolence and psychological symptoms; and can

frequently adapt to changes in workplace methods and routines.

Tr. 25.

In support of his RFC finding, the ALJ considered the entire record, including Amanda's hearing testimony, function report, and medical records. Tr. 25. The ALJ explained that, although Amanda's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements about the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence in the record. Tr. 32.

The ALJ began his analysis of Amanda's medical records by evaluating her alleged history of narcolepsy and cataplexy, as those two conditions comprise the basis of Amanda's disability claim and were the primary focus of hearing testimony. Tr. 25–26. The ALJ noted that the claim record was devoid of "records or testing to independently establish the diagnoses of either narcolepsy or cataplexy." Tr. 26.

Amanda's treating primary care physician, Dr. Brandon Williamson, "did not diagnose her with Narcolepsy or Cataplexy." Tr. 26. Instead, Dr. Williamson diagnosed Amanda with somatic symptom disorder and major depression. *Id.* The ALJ found Dr. Williamson's "diagnoses most clearly describe the claimant's mental status and are the diagnoses most consistent with and supported by the medical records." *Id.*

Most of the references to narcolepsy and cataplexy in Amanda's records are based on representations that Amanda made to her providers. The ALJ observed that in Amanda's chiropractic care records from Richard Stephenson, D.C., "Narcolepsy is mentioned in [the] chart only as a historic diagnosis, based only upon the claimant's historical report." Tr. 27. The ALJ pointed out that Amanda's social work records indicated "that the claimant had Narcolepsy 'complicated by OSAA and sleep

behavior.'" *Id.* But the ALJ noted, "[a]gain, this was a historical representation by the claimant only," unsupported by testing or other diagnostic means. *Id.*

The ALJ reviewed the records of Amanda's visits with neurologist Dr. Todd Maraist, who diagnosed Amanda with narcolepsy "apparently based solely on her history" as he did not conduct an evaluation or testing. Tr. 27. The ALJ observed that on Amanda's subsequent visits between 2019 and 2022, Dr. Maraist maintained the narcolepsy diagnosis but never performed testing to confirm it. Tr. 27–28. Treatment notes by Amanda's neurologist, Dr. Onyedika Moghalu, in September 2022 revealed that an MRI of Amanda's "brain was unremarkable for any cause for the alleged narcolepsy/cataplexy." Tr. 28; Tr. 405. The ALJ also noted that Amanda had been "refer[red] to the Houston Methodist Neurology Sleep clinic," but her records "do[] not establish whether [she] followed up with the referral." Tr. 27 (citing Tr. 411, 414, 417). It appears that she did not. *Id.*

The ALJ discussed the various references to cataplexy in Amanda's records. The ALJ found that in 2019, Dr. Maraist noted, "[Amanda] is not having cataplexy." Tr. 28 (citing Tr. 426). The ALJ pointed out that in September 2021, Amanda "described a specific cataplexic event," which was "the first time such an event was noted to have been described . . . to a healthcare provider." *Id.* (citing Tr. 467–68). However, "the clinician further noted that no cataplexy was observed by her during the evaluation that day." *Id.*

Despite concluding that there was no independent confirmation of Amanda's narcolepsy and cataplexy diagnoses, the ALJ "still examin[ed] the record for evidence of the events that are alleged to cause the alleged limitations" in order to establish Amanda's functional limitations. *Id.* The ALJ reviewed Amanda's medical records in detail and compared them to the hearing

testimony about Amanda's daily activities and limitations. Tr. 26–32.

The ALJ discussed physical examinations of Amanda performed by Dr. Maraist, in which he stated that Amanda's "exams all remain[ed] grossly normal as to all systems." Tr. 28; *see also* Tr. 426–29. Provider notes from a September 2022 visit revealed that Amanda "was pleasant, cooperative, and sat calmly," and was otherwise normal, though Amanda reported that "she would fall asleep about 2 pm (which affected her school schedule)." Tr. 28. In 2023, Amanda was described as "well groomed, dressed[,] and cooperative" with a normal "speech rate, volume, tone, and prosody." Tr. 29. She had "logical, linear, goal directed, and intact" thought processes, and she participated "meaningfully in development of treatment plan." *Id.* Similarly, about four months later, Amanda "had a normal cognitive exam," despite her mild anxiety and depressed mood, and she exhibited no physical abnormalities. *Id.*

Further, the ALJ discussed Amanda's representations to medical providers indicating that "she was motivated towards working on finishing her undergraduate degree." Tr. 28. In August 2022, Amanda reported to her provider at Texas A&M University Health that "she was about to start [four] classes . . . ." *Id.* (citing Tr. 534). Additionally, Amanda noted that she was exercising more—swimming, cycling, and taking yoga classes. *Id.* (citing Tr. 797); *see also* Tr. 534 (referencing Amanda's weight loss and yoga classes). The ALJ concluded that "[a]ll of this planned and present activity is inconsistent with having severe limitations from narcolepsy/cataplexy." Tr. 28.

The ALJ also considered the initial- and reconsideration-level opinions of reviewing state agency psychological consultants and medical consultants. Tr. 29. The initial state agency psychological consultant assigned to Amanda's claims, Dr. Janice

14

Ritch, concluded that Amanda "could get along with and interact with familiar coworkers on an occasional basis" and "respond appropriately to changes in the work setting that were occasional and not frequent." Tr. 65, 74. On reconsideration, another state agency psychological consultant, Dr. Karla Delcour, adopted Dr. Ritch's initial conclusions, noting that the new medical evidence provided did not change the decision or prior evaluation. Tr. 83–84, 95–96.

The ALJ found the opinions of the state agency psychological consultants to be partially persuasive because the opinions were not entirely consistent with Amanda's medical records. Tr. 29. The ALJ observed that "the record of physical and mental examinations consistently showed" that Amanda's "speech rate, volume, tone, and prosody were normal"; her "affect was appropriate"[;] "she had a euthymic mood"; her "thought processes were logical, linear, goal directed and intact[,]" as was her "attention and concentration"; she "was alert and oriented to time, person, place, and situation[;]" and her "memory, insight, and judgment were also intact[.]" *Id.* (citing Tr. 969).

The state agency medical consultants, Drs. Folarin and Ligon, opined that "the claimant's physical impairments were nonsevere." Tr. 29. Their reports concluded that Amanda's "[a]lleged symptoms are partially supported by the EOR" (Evidence of Record). Tr. 63. The ALJ determined that the medical consultants' opinions were partially persuasive. Tr. 29. He explained that while the "consultants adequately considered [Amanda's] subjective complaints and the combined effect of [Amanda's] impairments[,] . . . the record did not contain a sleep study, EMG, or EEG . . . the [MRI] was unremarkable[,] . . . [Amanda's] physical examination findings were almost all completely normal, . . . [and h]er physical diagnoses . . . were all maintained as stable on medication." *Id.*

15

Finally, the ALJ reviewed the April 24, 2023 report of Dr. Onyedika Moghalu, Amanda's treating neurologist, in which Dr. Moghalu stated that Amanda "experienced cataplexy and narcolepsy confirmed with MRI of the brain and sleep study." Tr. 30; *see also* Tr. 976–76. Dr. Moghalu said that Amanda "may need breaks at unpredictable intervals during the workday" due to her symptoms, that she "would miss more than four-[days per month] due to impairments and/or treatment," and that she "would have serious limitations in maintaining attention for two-hour segments, be[ing] punctual within customary usually strict tolerances, and deal[ing] with normal work stresses." Tr. 30.

The ALJ stated that Dr. Moghalu's opinion was "not persuasive" because "it was inconsistent with the objective medical record," which lacked "the results of a sleep study, an EMG, or EEG." Tr. 30. The ALJ concluded that Dr. Moghalu's "opinions regarding limitations appear to be based primarily upon [Amanda's] subjective history of taking naps, and are inconsistent with and not supported by the normal physical examinations, mostly normal mental status examinations, and objective findings in the other medical records . . . ." *Id.*

The ALJ found that "the conclusion that [Amanda] did not have an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities was supported by the totality of the objective medical evidence of record and the hearing testimony." Tr. 32. The ALJ's RFC finding is correct and supported by substantial evidence.

Amanda argues that the ALJ's RFC determination was not supported by substantial evidence. ECF No. 11. First, Amanda argues that the ALJ failed to give proper weight to the functional evaluations of the state agency psychological consultants, thereby incorrectly determining Amanda's RFC. *Id.* at 13. Second, Amanda argues that the ALJ's RFC determination was not based on

substantial evidence because the ALJ did not sufficiently develop the record, because the ALJ mischaracterized the medical evidence, and because the ALJ substituted his lay opinion for that of Amanda's treating neurologist, Dr. Onyedika Moghalu. *Id.* at 19.

The court first addresses whether the ALJ failed to adequately assess the supportability and consistency of the state agency's psychological consultants' opinions. ECF No. 11 at 13. To determine "what weight, if any, to give a medical opinion," ALJs consider a list of factors, outlined in 20 C.F.R. § 404.1520c. *Webster*, 19 F.4th at 719. In his decision, the ALJ must explain his consideration of the supportability and consistency factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The supportability factor relates to how much the objective medical evidence and the medical source's explanation supports the medical opinion, while the consistency factor relates to the medical opinion's consistency with evidence from other medical sources. 20 C.F.R. §§ 404.1520c(c)(1)–(2), 416.920c(c)(1)–(2).

The state agency psychological consultants assigned to Amanda's claims, Drs. Ritch and Delcour, concluded that Amanda "could get along with and interact with familiar coworkers on an *occasional* basis" and "respond appropriately to changes in the work setting that were *occasional* and *not frequent.*" Tr. 65, 74, 83–84, 95–96 (emphasis added). However, the ALJ determined that Amanda could "*frequently* interact with supervisors, coworkers, and the public" and "*frequently* adapt to changes in workplace methods and routines." Tr. 25 (emphasis added).

The ALJ explained that he found the opinions of Drs. Ritch and Delcour to be "partially persuasive," as "the record of physical and mental examinations consistently showed" that Amanda's "speech rate, volume, tone, and prosody were normal"; her "affect was appropriate"[;] "she had a euthymic mood"; her "thought

processes were logical, linear, goal directed and intact[,]" as was her "attention and concentration"; she "was alert and oriented to time, person, place, and situation[;]" and her "memory, insight, and judgment were also intact[.]" Tr. 29 (citing Tr. 969). This explanation goes far beyond mere "cursory, boilerplate language about carefully considering the entire record." *See Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017). The ALJ's detailed explanation demonstrates that he considered the consistency and supportability of the doctors' opinions in light of the other medical opinions and evidence in Amanda's record.

Further, "[a] policy decision from the SSA defines 'frequent' as meaning that the activity may occur 'from one-third to two-thirds of the time." *Madkins v. Bisignano*, No. 24-60485, 2025 WL 2527452, at *3 (5th Cir. Sept. 3, 2025) (citing SSR 83-10, 1983 WL 31251, at *6). The ALJ's determination that Amanda could "*frequently* interact with supervisors, coworkers, and the public" and "*frequently* adapt to changes in workplace methods and routines" does not clearly conflict with the doctors' findings of "moderate" limitations. *See id.* (holding that an ALJ's determination that a claimant could "frequently interact with others in the work setting" did not clearly conflict with the moderate limitations proposed by the state agency psychological consultant).

Thus, the court finds that the ALJ adequately assessed the supportability and consistency of the state agency's psychological expert opinions, and the resulting RFC determination was supported by substantial evidence.

The court next turns to Amanda's argument that the ALJ's RFC determination was not based on substantial evidence because he made three additional errors: (1) the ALJ did not sufficiently develop the record, (2) the ALJ mischaracterized medical evidence,

and (3) the ALJ substituted his lay opinion for that of Amanda's treating neurologist, Dr. Onyedika Moghalu.

Amanda argues that the ALJ had a duty to obtain the results of a sleep study, which Amanda alleges would corroborate her narcolepsy diagnosis. ECF 11 at 19. Because the ALJ did not make "any attempt to secure, or even to thoroughly review the record, to locate" the missing "sleep study, EMG, or EEG," Amanda asserts that the ALJ was unable to properly determine her capacity to work. *Id.*

While the ALJ has "a duty to fully and fairly develop the facts," the Fifth Circuit has rejected the idea that the ALJ must "collect[] all existing records." *Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015). "[I]mposing a duty on the ALJ to obtain all of a claimant's medical records would be in tension with the C.F.R.'s explicit provision that the Commissioner will 'make every reasonable effort to help [the claimant] get medical reports from [their] own medical sources' by making 'an initial request for evidence from [the claimant's] medical source and . . . one followup request to obtain medical evidence necessary to make a determination' . . . ." *Id.*; *see also* 20 C.F.R. §§ 404.1512(b)(1)(i), 416.912(b)(1)(i).

Here, the ALJ complied with his obligations under 20 C.F.R. §§ 404.1512(d) and 416.912(b)(1)(i). On initial review, the agency obtained medical records from three of Amanda's providers, and on reconsideration, the agency obtained records from three additional providers and then submitted a follow-up request for records to two of those providers. Tr. 77. Amanda's hearing record consists of more than 600 pages of medical records. *See* Tr. 322–1001. Nevertheless, the ALJ "noted that there are no records or testing to independently establish the diagnoses of either narcolepsy or cataplexy throughout the entire claim record." Tr. 26. Further, the ALJ pointed out that even Amanda's medical

providers had been unable to obtain records that corroborate her narcolepsy and cataplexy diagnoses. Tr. 27 ("It is concerning, and telling, that despite reporting to Dr. Williamson the identities of four previous health care providers, the claimant was not able to facilitate them providing to him records to support her history of previous diagnosis and treatment."); *see also* Tr. 393. The ALJ did not err by failing to obtain Amanda's missing sleep study. It is not even clear that such a study exists. It appears that it would have been futile for the ALJ to make further efforts to obtain it.

Amanda next argues that "the ALJ erred by misstating or mischaracterizing medical evidence because the ALJ wrote that 'neither [Dr. Moghalu's] nor the other records contained the results of a sleep study.'" *Id.* at 20 (citing Tr. 30). She alleges that this was a mischaracterization because "the record does in fact contain the results of a sleep study dated July 28, 2020, which resulted in the impression of 'Mild Obstructive Sleep Apnea becoming severe with REM (G47.33) corrected with CPAP[.]'" *Id.* (citing Tr. 686).

In this portion of the ALJ's decision—which Amanda takes out of context—the ALJ explains why he did not find Dr. Moghalu's April 24, 2023 opinion to be persuasive. Tr. 30. Dr. Moghalu's opinion was "that the claimant experienced cataplexy and narcolepsy confirmed with MRI of the brain and sleep study." *Id.*; *see also* Tr. 975–76. After describing the doctor's findings in detail, the ALJ concluded:

> The opinion was not persuasive as it was inconsistent with the objective medical record. Specifically, neither his nor the other records contained the results of a sleep study, an EMG, or EEG. His opinions regarding limitations appear to be based primarily upon the claimant's subjective history of taking naps, and are inconsistent with and not supported by the normal physical examinations, mostly normal mental status

examinations, and objective findings in the other
medical records . . . .

Tr. 30.

The court's review of the medical evidence supports the
ALJ's finding. There is no evidence of a sleep study, EMG, or EEG
that reveals a diagnosis of cataplexy and narcolepsy. The only
sleep study included in the record is the July 28, 2020 study that
confirms Amanda's obstructive sleep apnea. Tr. 685–86.
Accordingly, the court finds no misstatement or
mischaracterization by the ALJ.

Third, Amanda argues that the ALJ erred by substituting
his own opinion for Dr. Moghalu's opinion instead of developing
the record. ECF 11 at 21. Amanda claims that "despite ample
references in the record to years of narcolepsy and sleep medicine
treatment received by the Plaintiff, the ALJ chose to substitute his
own lay opinion instead of develop the record." *Id.* at 21–22. In
support, Amanda cites *Frank v. Barnhart*, 326 F.3d 618, 622 (5th
Cir. 2003), in which "the ALJ made his own medical conclusions
about whether a patient would show signs of atrophy or muscle
tone loss as a result of [the claimant's] alleged impairments."

Here, the ALJ made no such independent medical
assessment about Amanda's condition. He merely made a
determination as to the credibility of a provider, and accordingly,
whether to accept that provider's characterization of Amanda's
limitations. As previously stated, the ALJ must explain how he
considered the factors of supportability and consistency when
assessing a medical opinion's persuasiveness. 20 C.F.R.
§§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ clearly did that here.
Accordingly, the ALJ did not err, and the court finds that the ALJ's
RFC determination was based on substantial evidence.

### E. Step Four

At step four, the ALJ determines whether the claimant can perform jobs she previously worked by comparing the RFC determination with the demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f); *see also Perez*, 415 F.3d at 462. If the claimant can perform her past work, she is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant cannot perform her past work, the ALJ proceeds to step five. *See* 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

Based on the VE's answer to the interrogatory and the limitations recognized in the RFC, the ALJ determined that Amanda is capable of performing her past work as a legal assistant, switchboard operator/receptionist, and bank teller. Tr. 32. This finding is supported by substantial evidence.

### F. Step Five

At step five, the ALJ determines whether the claimant can perform any other work by considering the claimant's RFC and other factors, including age, education, and past work experience. *Schofield*, 950 F.3d at 318 (quoting 20 C.F.R. § 404.1520(a)(4)(v)). If the claimant can perform other work available in significant numbers in the national economy, the claimant is not disabled. *Id.* (citing 20 C.F.R. § 404.1520(g)).

Because the ALJ found that Amanda could perform jobs that exist in significant numbers in the national economy, the ALJ made an alternative finding for step five. Tr. 33. The ALJ relied on the VE's answer to the interrogatory, which stated that an individual of Amanda's age, education, work experience, and RFC would be able to work as a marker, as a mail clerk, or in assembly/small products. *Id.*; *see also* Tr. 311–13 (VE's interrogatory).

Because the VE's testimony was based on the ALJ's hypothetical question, which incorporated all the limitations reasonably recognized by the ALJ, and Amanda's counsel had the opportunity to object to the questions submitted to the VE, as well as to submit her own, the VE's testimony is substantial evidence that supports the ALJ's step five determination. *See Masterson v. Barnhart*, 309 F.3d 267, 273–74 (5th Cir. 2002) (holding that the ALJ properly relied on the VE's testimony because the ALJ "scrupulously incorporated" all the limitations "supported by the evidence and recognized by the ALJ" and gave an opportunity for cross examination). Accordingly, the ALJ's findings at step five are supported by substantial evidence.

### 4. Conclusion

The ALJ's decision denying social security benefits is consistent with the law and supported by substantial evidence. There is no genuine issue of material fact, and summary judgment is appropriate. Fed. R. Civ. P. 56(a), (c).

Accordingly, Amanda's Motion for Summary Judgment, ECF No. 11, is **DENIED**. The Commissioner's Motion for Summary Judgment, ECF No. 18, is **GRANTED**, and the Commissioner's final decision is **AFFIRMED**.

A separate final judgment will be entered.

Signed at Houston, Texas on September 25, 2025.

_____
Peter Bray
United States Magistrate Judge